Susan ATKINS, Petitioner,

v.

Dawn DAVISON, Warden, Respondent.

Case No. EDCV 07–1202–AHM (JTL).

United States District Court,
C.D. California.

Dec. 1, 2009.

James W. Whitehouse, James W. Whitehouse Law Offices, San Juan Capistrano, CA, for Petitioner.

Kim Aarons, CAAG–Office of Attorney General of California, San Diego, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

A. HOWARD MATZ, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition for Writ of Habeas Corpus, all the records and files herein, and the Final Report and Recommendation of the United States Magistrate Judge. Objections to the Report and Rec-

ommendation have been filed herein. Having made a de novo determination of those portions of the Report and Recommendation to which objection has been made, the Court concurs with and adopts the findings, conclusions and recommendations set forth in the Final Report and Recommendation of the Magistrate Judge.

IT IS ORDERED that judgment be entered dismissing the Petition for Writ of Habeas Corpus with prejudice.

## JUDGMENT

In accordance with the Final Report and Recommendation of the United States Magistrate Judge filed concurrently herewith,

IT IS HEREBY ADJUDGED that the Petition for Writ of Habeas Corpus is denied and this action is dismissed with prejudice.

## FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JENNIFER T. LUM, United States Magistrate Judge.

The Court submits this Final Report and Recommendation to the Honorable A.

Howard Matz, United States District Judge, pursuant to 28 U.S.C. Section 636 and General Order 05–07 of the United States District Court for the Central District of California.

## PROCEEDINGS

On September 20, 2007, Susan Atkins ("Petitioner"), a prisoner in state custody, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254 ("Petition"). On January 11, 2008, Dawn Davison ("Respondent") filed an Answer to the Petition ("Answer"). Petitioner filed a Reply to the Answer ("Reply") on February 7, 2008.

On February 24, 2009, the Court issued a Report and Recommendation, recommending that the district court dismiss the Petition with prejudice. Thereafter, on March 12, 2009, Petitioner filed her Objections to the Report and Recommendation ("Objections").

## BACKGROUND

### I. *THE COMMITMENT OFFENSE*

Petitioner's conviction stems from her participation in the Manson family murders that occurred in 1969.[1] On January

---

1. The basic facts of the murders are set forth in the appellate opinion affirming Petitioner's conviction in *People v. Manson*, 61 Cal.App.3d 102, 124–27, 132 Cal.Rptr. 265 (1976). Petitioner belonged to a commune, known as the "Family," which was under the leadership of Charles Manson ("Manson"). *Id.* at 127, 132 Cal.Rptr. 265. Manson dominated the Family and incalculated its members with his bizarre apocalyptic views. He believed that the Beatles' song, "Helter Skelter," warned of an impending race war between whites and blacks, after which Manson and his followers would restore order and take control. *Id.* at 129–30, 132 Cal.Rptr. 265. He intended to precipitate this race war by murdering whites in a way that would be ascribed to blacks. *Id.*

In accordance with this plan, on August 8, 1969, Petitioner and three other members of

the Family went to the residence of Sharon Tate and murdered Tate, Wojiciech Frykowski, Abigail Folger, Jay Sebring, and Steve Parent. *Id.* at 124, 131–32, 132 Cal.Rptr. 265. The victims were shot, clubbed, and/or stabbed multiple times. *Id.* at 125, 132 Cal. Rptr. 265. The word "Pig" was written in Tate's blood on the door. *Id.* at 124 & n. 4, 132 Cal.Rptr. 265.

The next day, Petitioner drove with Manson and some other members of the Family to the residence of Leno and Rosemary LaBianca. *Id.* at 132–33, 132 Cal.Rptr. 265. Petitioner did not enter the residence. *Id.* at 133, 132 Cal.Rptr. 265. The LaBiancas, however, were stabbed multiple times and killed. *Id.* at 125, 132 Cal.Rptr. 265. Slogans were written in the victims' blood on the walls. *Id.* at 125, 132 Cal.Rptr. 265.

25, 1971, in Los Angeles County Superior Court case number A253156, a jury found Petitioner guilty of seven counts of first degree murder and one count of conspiracy to commit murder, and fixed the penalty at death. (*See* Respondent's Lodgment No. 2). On April 19, 1971, the trial court sentenced Petitioner to death. (Respondent's Lodgment No. 3). On May 27, 1971, Petitioner pleaded guilty to an additional charge of first degree murder, in Los Angeles County Superior Court case number A267861, and was sentenced to a term of life imprisonment with the possibility of parole. (Respondent's Lodgment No. 4; *see* Respondent's Lodgment Nos. 5, 6). Shortly thereafter, the California Supreme Court held that the death penalty was unconstitutional. *People v. Anderson,* 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880 (1972), *cert. denied,* 406 U.S. 958, 92 S.Ct. 2060, 32 L.Ed.2d 344 (1972). On December 13, 1972, the trial court vacated Petitioner's death sentence and re-sentenced Petitioner to seven concurrent terms of life with the possibility of parole. (Respondent's Lodgment No. 1).

In this habeas action, Petitioner challenges the execution of her sentence, rather than her conviction. Specifically, she asserts that there were numerous constitutional errors in the June 1, 2005 Board of Prison Terms ("BPT" or "Board") finding that she was unsuitable for parole.[2]

## II. *PAROLE PROCEEDINGS*

On June 1, 2005, Petitioner appeared before a panel of the Board for her seventeenth parole suitability consideration hearing. (Respondent's Lodgment No. 7). The Board found that Petitioner was unsuitable for parole and that Petitioner posed an unreasonable risk of danger to society or threat to public safety if released from prison. The Board based its decision first and foremost on the nature of Petitioner's commitment offense. (*See id.* at 157–59).

In a separate decision, the Board denied Petitioner parole for an additional four years based on the nature of Petitioner's commitment offense, her unstable social history and prior criminal history, and the inconclusiveness of Petitioner's recent psychiatric report dated January 3, 2005, in which the staff psychiatrist wrote that, although Petitioner "offers what appears to be credible expressions of insight and remorse ... [c]omplete assurance of her acceptance of responsibility, insight and remorse will probably always be clouded somewhat by the factual disputes that stem from her earlier versions of the crime." (*Id.* at 159–64). The Board noted several factors favorable to parole were present (e.g., Petitioner's realistic and acceptable parole plans, development of marketable skills and extensive participation in a variety of programs including substance abuse programs), but concluded that the positive aspects of Petitioner's behavior did not outweigh the factors of unsuitability and, thus, denied parole for four years. (*See id.* at 162–63). The Board also found that Petitioner needed "further therapy in order to develop insight into the commitment offense and the underlying cause of the offense." (*Id.* at 163).

Earlier, on July 25, 1969, Manson, Petitioner, and three other members of the Family tortured and killed Gary Hinman over a two-day period after he refused to give them money. Petitioner pleaded guilty to this murder. (*See* Respondent's Lodgment No. 4 at 6–12; Respondent's Lodgment No. 5). *See People v. Manson* (*"Manson II"*), 71 Cal.App.3d 1, 11–18, 139 Cal.Rptr. 275 (1977).

**2.** The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. Cal.Penal Code § 5075(a). Nevertheless, because Petitioner's parole consideration hearing occurred earlier, on June 1, 2005, the Court will refer to the Board of Prison Terms.

## III. STATE HABEAS PROCEEDINGS

On July 14, 2006, Petitioner filed a petition for writ of habeas corpus in the Los Angeles County Superior Court, alleging that the Board's 2005 denial of parole violated her right to due process. (Respondent's Lodgment No. 8). In its April 10, 2007 decision denying the petition, the superior court determined that there was "some evidence" to support the Board's finding that Petitioner was unsuitable for parole:

Petitioner was received into custody on April 23, 1971, after being convicted of seven counts of first degree murder. Petitioner received a term of seven years to life with a minimum eligible parole date of September 1, 1976. The record reflects that, at the time of the commitment offenses, [P]etitioner was a member of Manson Family. On July 25, 1969, [P]etitioner and four crime partners went to their first victim's home to solicit money. He was kept prisoner in his home for a period of time during which his ear was cut off and he was repeatedly stabbed. Petitioner participated in suffocating the victim as he lay dying from a stab wound to the heart. On August 9, 1969, [P]etitioner and her co-defendants broke into the home of Sharon Tate Polanski, after shooting a neighbor's visitor outside the residence. Inside, they repeatedly stabbed the four occupants. One victim was killed by a gunshot wound to the back and multiple blunt force traumas to the head. The other three were repeatedly stabbed to death. The blood of one victim was used to paint the word "PIG" on the walls. The following day, [P]etitioner accompanied other members of the Manson Family to the home of Leno and Rosemary LaBianca, whom they also murdered by stabbing. These murders were all committed for the purpose of inciting a race war.

. . .

The Court finds that there is some evidence to support the Board's finding that [Petitioner] is unsuitable for parole based on the commitment offense. Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh[ ] heavily the degree of violence used and the amount of viciousness shown by a defendant. (In re Rosenkrantz (2002) 29 Cal.4th 616, 683 [128 Cal.Rptr.2d 104, 59 P.3d 174].) There is some evidence to support the Board's finding that multiple victims were killed in the same and separate incidents. (Cal.Code Regs., tit. 15 § 2402, subd. (c)(1)(A).) Petitioner personally participated in the deaths of six victims and was involved in the deaths of another two victims. The Court also finds that there is some evidence to support the [B]oard's finding that the offense was carried out in [a] manner that demonstrates an exceptionally callous disregard for human suffering. (Cal.Code Regs., tit. 15, § 2402(c)(1)(D).) An "exceptionally callous disregard for human suffering" means the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of that offense. (In re Scott (2004) 119 Cal.App.4th 871, at 891 [15 Cal.Rptr.3d 32]). The [B]oard found that these murders were committed in [a] manner showing an "extremely high level of violence and savagery." [Respondent's Lodgment No. 7 at 158]. The victims were stabbed repeatedly over an extended period of time.

(Respondent's Lodgment No. 9 at 1–2).

Petitioner subsequently filed a petition for writ of habeas corpus in the California

Court of Appeal. (Respondent's Lodgment No. 10). The court of appeal summarily denied the habeas petition on July 3, 2007. (Respondent's Lodgment No. 11). Petitioner then filed a petition for review of the court of appeal's denial in the California Supreme Court. (Respondent's Lodgment No. 12). On August 29, 2007, the California Supreme Court summarily denied the petition for review. (Respondent's Lodgment No. 13).

Petitioner filed the instant Petition on September 20, 2007.[3]

### PETITIONER'S CONTENTIONS

1. Petitioner's parole process was arbitrary because the Board intentionally violated the law, falsified information, and used Petitioner's thirty-six year-old conviction.

2. The Board's actions violated substantive due process by intentionally subverting the parole process.

3. Petitioner was not given access to the materials used against her.

4. The Board's reliance on Petitioner's commitment offense in its decision did not satisfy the "some evidence" standard because the Board did not address Petitioner's present risk of danger to society.

5. The Board's decision and the District Attorney's office have violated Petitioner's plea agreement, thereby invalidating the plea agreement.

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the Court's consideration of Petitioner's cognizable federal claims. 28 U.S.C. Section 2254(d), as amended by AEDPA, states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

---

**3.** After Petitioner filed her Reply in this case, Petitioner submitted a request for "compassionate release" for approval by the Board of Parole Hearings. Pursuant to California Penal Code section 1170(e), the Board of Parole Hearings may recommend to the court with specified discretion that a prisoner's sentence be recalled. *See* Cal.Penal Code § 1170(e)(1). The court has discretion to resentence or recall if "[t]he prisoner is terminally ill with an incurable condition caused by an illness or disease that would produce death within six months, as determined by a physician employed by the department" and "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety." Cal.Penal Code § 1170(e)(2)(A)-(B). Alternatively, the court may resentence or recall if "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety" and "[t]he prisoner is perma-

nently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24–hour total care, including, but not limited to, coma, persistent vegetative state, brain death, ventilator-dependency, loss of control of muscular or neurological function, and that incapacitation did not exist at the time of the original sentencing." Cal.Penal Code § 1170(e)(2)(B)-(C). On July 15, 2008, the Board of Parole Hearings held a closed session hearing on Petitioner's request and denied "compassionate release," declining to refer the matter to the Los Angeles County Superior Court for consideration of recalling her sentence. *See* Board of Parole Hearings En Banc Decisions, Tuesday, July 15, 2008, www.cdcr.ca.gov/Divisions_Boards/BOPH/docs/enbanc07–15–08.pdf, www.cdcr.ca.gov/Divisions_Boards/BOPH/docs/JulyMeeting Agenda2008.pdf

evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court held that a state court's decision can be contrary to federal law either 1) if it fails to apply the correct controlling authority, or 2) if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. A state court's decision can involve an unreasonable application of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495. The Supreme Court has admonished courts against equating the term "unreasonable application" with "clear error": "These two standards ... are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Instead, in this context, habeas relief may issue only if the state court unreasonably applied firmly established federal law. *Id.*

■ Here, Petitioner raised her current claims for relief in the state courts on habeas review. (*See* Respondent's Lodgment Nos. 8, 10, 12). The Los Angeles County Superior Court addressed Claim Four in a reasoned decision explaining why it denied Petitioner's claim. (Respondent's Lodgment No. 9). The California Court of Appeal and the California Supreme Court denied Petitioner's claims summarily. (Respondent's Lodgment Nos. 11, 13). The United States Supreme Court has held that "[w]here there has

been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Thus, with respect to Claim Four, the Court "looks through" the California Supreme Court's "silent denial" to the Los Angeles County Superior Court's reasoned decision, and reviews that decision under the AEDPA standards. *Id.; see Gill v. Ayers*, 342 F.3d 911, 917 n. 5 (9th Cir.2003) (the court " 'look[s] through' the unexplained California Supreme Court decisions to the last reasoned decision, the state appellate court's decision, as the basis for the state court's judgment"); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000) (same). Where a state court has issued a reasoned decision explaining why it denied a petitioner's claims for relief, the reviewing court must accord substantial deference to that decision and decide only whether it was contrary to, or resulted in an unreasonable application of, firmly established law. *See Andrade*, 538 U.S. at 75, 123 S.Ct. 1166; *Anderson v. Terhune*, 467 F.3d 1208, 1212 (9th Cir.2006).

In contrast, no California court has issued a reasoned decision addressing the merits of Claims One, Two, Three and Five. The Los Angeles County Superior Court did not explicitly address Petitioner's claims, and the California Court of Appeal and California Supreme Court denied the claims summarily, without comment or citation to authority. Thus, the Court must independently review the record to determine whether the state courts' denials of these claims were contrary to, or resulted in an unreasonable application of, firmly established law. *Delgado v. Lewis*, 223 F.3d 976, 981 (9th Cir.2000) (stating that courts give less deference where state court issues silent denial and requiring

federal court to conduct independent review); *see Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003); *see also Pinholster v. Ayers,* 525 F.3d 742, 756 n. 11 (9th Cir.2008).[4]

## DISCUSSION [5]

### I. *PETITIONER'S CLAIM BASED UPON AN ALLEGED VIOLATION OF THE PLEA AGREEMENT DOES NOT WARRANT FEDERAL HABEAS RELIEF*

■ In Claim Five, Petitioner argues that the Board and the District Attorney's office violated, and thereby invalidated, Petitioner's plea agreement. Petitioner argues that the "the State has reneged on the agreement" it made with Petitioner, and both the District Attorney and the Board have reviewed Petitioner's plea agreement and know she was not charged with, and did not plead guilty to, conspiracy, robbery or a mutilation crime with respect to the Hinman murder. Nonetheless, they continue to use these crimes as justification for denying her release from prison. (*See* Petition at 6; Reply at 5, 20–22). As set forth below, Petitioner's claim lacks merit.

■ "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *accord Mabry v. Johnson,* 467 U.S. 504, 509, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) ("[W]hen the prosecution breaches its promise with respect to an executed plea agreement, the

defendant pleads guilty on a false premise, and hence his conviction cannot stand."). Plea agreements are contractual in nature and subject to contract law standards of interpretation. *See Brown v. Poole,* 337 F.3d 1155, 1159 (9th Cir.2003) (quoting *United States v. De la Fuente,* 8 F.3d 1333, 1337 (9th Cir.1993)); *see also In re Ellis,* 356 F.3d 1198, 1207 (9th Cir.2004); *United States v. Kamer,* 781 F.2d 1380, 1387 (9th Cir.1986); *United States v. Arnett,* 628 F.2d 1162, 1164 (9th Cir.1979). The party asserting breach bears the burden of proving the underlying facts establishing a breach. *See United States v. Laday,* 56 F.3d 24, 26 (5th Cir.1995); *United States v. Packwood,* 848 F.2d 1009, 1011 (9th Cir.1988). In determining whether a plea agreement has been breached, courts consider what was "reasonably understood" by a defendant when he "entered his plea of guilty." *Gunn v. Ignacio,* 263 F.3d 965, 970 (9th Cir.2001); *see De la Fuente,* 8 F.3d at 1337 ("In construing [a plea] agreement, the court must determine what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty."); *see also United States v. Clark,* 218 F.3d 1092, 1095 (9th Cir.), *cert. denied,* 531 U.S. 1057, 121 S.Ct. 668, 148 L.Ed.2d 569 (2000) ("If . . . a term of a plea agreement is not clear on its face, we look to the facts of the case to determine what the parties reasonably understood to be the terms of the agreement."). "[A] party's contention regarding his subjective understanding is not dispositive; rather, any dispute over the terms of the agreement must be determined by objective standards." *Wheeler v. Yarbrough,* 352 F.Supp.2d 1085, 1094 (C.D.Cal.2005);

---

**4.** Petitioner erroneously argues that she is "only constrained by the AEDPA" with respect to Claim Four because it is the only claim that was "adjudicated on the merits in State Court." (*See* Reply at 6, 22). The state courts' denials of Petitioner's state habeas petitions without comment or citation constitute

a decision on the merits of the federal claims. *See Hunter v. Aispuro,* 982 F.2d 344, 347–48 (9th Cir.1992); *Pinholster,* 525 F.3d at 756 n. 11.

**5.** Petitioner's claims are not addressed in the same order as set forth in the Petition.

*see Buckley v. Terhune,* 441 F.3d 688, 695 (9th Cir.2006), *cert. denied sub nom. Tilton v. Buckley,* 550 U.S. 913, 127 S.Ct. 2094, 167 L.Ed.2d 831 (2007) ("Courts look to the 'objective manifestations of the parties intent[.]' " (citation omitted)).

In California, a negotiated plea agreement is a form of a contract to be construed and interpreted in accordance with state contract law. 441 F.3d at 695. To this end, a court must look first to the plain meaning of the agreement's language. *Id.* If the language is ambiguous, the court must look to the "objectively reasonable" expectation of the promisee. *Id.* If the ambiguity remains, the language of the agreement should be interpreted most strongly against the party who caused the uncertainty to exist. *Id.* at 695–96.

In this case, the plain language of Petitioner's plea agreement, as reflected in the plea transcript shows that, as to the murder of Gary Hinman in Los Angeles County Superior Court case number A267861, Petitioner was charged with one count of willful, unlawful and felonious murder with malice aforethought (Cal.Penal Code § 187; Count 1) on July 27, 1969, and one count of conspiracy to commit robbery and murder (Cal.Penal Code § 182(1); Count 2) between the dates of July 25 and July 28, 1969. (*See* Respondent's Lodgment No. 4 at 2). Petitioner pleaded guilty to first degree murder in exchange for the prosecution's recommendation that she receive a sentence of life imprisonment, rath-

er than death. (*See id.* at 6, 10, 12–13). During the plea colloquy, Petitioner admitted that she went to Hinman's home on July 25, 1969, and stayed there on and off until July 27, 1969. (*See id.* at 6–7). When asked whether she was aware that a robbery was taking place in connection with Hinman's property, Petitioner responded that she "was aware that there was a transaction going on," but was not aware that a robbery was taking place.[6] (*See* Respondent's Lodgment No. 4 at 7–8). Petitioner admitted to knowingly participating in the killing of Hinman, with knowledge and an intention that her acts would result in his death. (*See id.* at 8, 9, 11). Specifically, Petitioner confirmed that she used a pillow to muffle or cut off Hinman's breath. (*See id.* at 12). Petitioner also admitted to wiping Hinman's house down for fingerprints after he died and removing garbage and bandages used to bandage the injured Hinman between July 25 and July 27, 1969.[7] (*See* Respondent's Lodgment No. 4 at 8–9). The prosecution explained that it would recommend a sentence of life imprisonment because the evidence showed that Petitioner "did not wield the death weapon, but rather is guilty of first degree murder on an aiding and abetting theory, and on a conspiracy theory to commit murder and robbery of Gary Alan Hinman" and, given that Petitioner had been convicted of seven counts of first degree murder and received seven, possibly eight, death sentences in Los Angeles County Superior Court case number

**6.** The Probation Officer's Report in Los Angeles County Superior Court case number A267861 describes the circumstances of the offense as follows:

> On or about July 25, 1969, [Petitioner], Robert Kenneth Beausoleil, Charles Manson, Bruce Davis, and Mary Brunner, together and separately went to the home of victim, Gary Hinman, to solicit money from him. Victim, apparently failing to satisfy their requests, was kept prisoner for a period of time, cut and stabbed repeatedly.

> Cause of death was ascribed to a stab would in the heart. The body was discovered on July 31, 1969.

(Respondent's Lodgment No. 5).

**7.** When asked if she "assist[ed] in wiping [ ] Hinman's house down for finger prints, and removing garbage and other paraphernalia used to bandage the injured Hinman," Petitioner replied, "Take out the word assist." (Respondent's Lodgment No. 4 at 8).

A253156, the interests of justice favored a life imprisonment sentence. (*See id.* at 13). Petitioner then pleaded guilty to first degree murder as to Count 1, in that she "wilfully, unlawfully and feloniously and with malice aforethought" murdered Hinman. (*See id.*). The trial court approved and entered the plea and sentenced Petitioner to life in prison. (*See id.* at 13, 14–15).

The Court notes that the plea transcript is unclear as to whether the charge of conspiracy to commit robbery and murder in Count 2 was dropped during the course of plea bargaining.[8] After the prosecution described the crimes with which Petitioner was charged—willful, unlawful, felonious murder with malice aforethought in Count 1 and conspiracy to commit robbery and murder in Count 2—the prosecution stated, and Petitioner confirmed, that she wished to withdraw her plea of not guilty to Count 1 and plead guilty to murder in the first degree. (*See* Respondent's Lodgment No. 4 at 2–3). The prosecution subsequently explained to Petitioner:

> [M]urder is the unlawful killing of a human being with malice aforethought. Murder is classified into two degrees, first and second degree. Murder—all murder which is perpetrated by any kind of wilfull [sic], deliberate and premeditated killing with malice aforethought is murder of the first degree. Also, under the felony murder doctrine, the unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or intent to commit the crime of robbery, and where there was, in the mind of the perpetrator, the spe-

cific intent to commit such crime, i.e., the robbery, that is murder in the first degree.

(Respondent's Lodgment No. 4 at 5). In connection with the charge of murder in Count 1, the prosecution proceeded to question Petitioner regarding the factual circumstances of the offense, at which point Petitioner indicated that she knew a "transaction" was taking place, but was not aware that any robbery was taking place. (*See* Respondent's Lodgment No. 4 at 6–8). The trial court interjected and asked Petitioner if she understood that "a murder, a homicide that's committed in the course of a robbery ... is a murder of the first degree[.]" (*Id.* at 7). The prosecution subsequently explained that its recommendation of a life sentence was, in part, based on the evidence showing that Petitioner was "guilty of first degree murder on an aiding and abetting theory, and on a conspiracy theory to commit murder and robbery of Gary Alan Hinman." (*See id.* at 13). Ultimately, the trial court approved and entered Petitioner's plea of guilty to first degree murder in Count 1, in that she "wilfully, unlawfully and feloniously and with malice aforethought murder[ed][ ] Hinman." (*Id.*).

Even construing the ambiguity as to whether the conspiracy to commit robbery and murder charged in Count 2 was dropped in favor of Petitioner, *see De la Fuente,* 8 F.3d at 1337 n. 7, the record is clear that Petitioner received the benefit of her plea bargain—in exchange for pleading guilty to first degree murder, the prosecution recommended that she be sentenced to life in prison rather than death. The trial court accepted the prosecution's rec-

---

8. The Court also notes that, although Petitioner argues that she "was told by the [prosecution] that she was not being tried, convicted or sentenced for robbery or conspiracy" (Reply at 20), the plea transcript does not include such a statement. At Petitioner's June 1,

2005 parole hearing, however, the District Attorney indicated that "the conspiracy to commit murder count was dismissed in the plea bargaining on the Gary Hinman murder." (Respondent's Lodgment No. 7 at 85).

ommendation and sentenced Petitioner accordingly. According to the plea transcript, a life imprisonment sentence was the only benefit Petitioner would receive under the plea agreement. (*See* Respondent's Lodgment No. 4 at 6, 10).[9] Petitioner has not alleged, and the record does not indicate, that the prosecution specifically promised that, as a condition of the plea agreement, the offense would be characterized or described in a particular manner in future parole hearings.[10] Thus, Petitioner's guilty plea did not "rest[ ] in any significant degree on [such] a promise or agreement of the prosecutor so that it can be said to be part of the inducement or consideration" of the plea agreement. *See Santobello,* 404 U.S. at 262, 92 S.Ct. 495;

see also *In re Honesto,* 130 Cal.App.4th 81, 93, 29 Cal.Rptr.3d 653 (2005) (rejecting superior court's conclusion that the Board violated the petitioner's plea agreement by denying him parole based on the facts of his offense where the petitioner failed to establish that "any express or implied term of his plea agreement precluded the Board from exercising its statutorily authorized discretion to consider the facts of the offense in determining his suitability for parole"); *In re DeLuna,* 126 Cal. App.4th 585, 599, 24 Cal.Rptr.3d 643 (2005) (finding that nothing in the record indicated that the petitioner's plea agreement included a promise by the prosecutor that the petitioner would be released on parole at any specific time or that the prosecutor

---

**9.** During the plea hearing, the prosecutor asked Petitioner whether "anyone told you, other than the fact that you will receive, in return for your plea to murder in the first degree, a life imprisonment sentence, anything else, any benefit, any reward or any other promise of leniency," and Petitioner responded, "No." (*See* Respondent's Lodgment No. 4 at 6). Petitioner's then-counsel also confirmed that, other than the fact that the prosecution would recommend a life sentence upon approval of Petitioner's guilty plea, no promise of a lesser sentence, reward or immunity had been made to induce Petitioner to enter the plea. (*See id.* at 10).

**10.** Petitioner cites to *Carter v. McCarthy,* 806 F.2d 1373 (9th Cir.1986) and *Chizen v. Hunter,* 809 F.2d 560 (9th Cir.1986), in support of her arguments that she was not informed that the crime to which she pleaded guilty to would be characterized as a "mutilation" crime and that the Ninth Circuit "has made it clear [that] failure to inform a defendant of the parole consequences of a plea agreement render it involuntary." (Reply at 21).

Petitioner's reliance on *Carter* and *Chizen* is misplaced. In *Carter,* the petitioner asserted that the trial court's failure to inform him of the mandatory parole term at the time of his plea violated his due process rights. *See Carter,* 806 F.2d at 1374. The Ninth Circuit held that "[w]here a criminal statute imposes a

mandatory parole term to be served following completion of the period of confinement, the parole term necessarily is a direct consequence of the guilty plea." *Id.* at 1376. Thus, inasmuch as the petitioner was not fully aware of the direct consequences of his guilty plea, his plea was not voluntary and intelligent and acceptance of his plea violated due process. *Id.* In *Chizen,* the petitioner was told by his attorney that the trial judge had agreed not to sentence him to more than 90 days, and he was operating under this belief when he signed a *Tahl–Boykin* waiver form and during the plea colloquy. *Chizen,* 809 F.2d at 563. It was only later, prior to sentencing, that the petitioner became aware that he had been misled by his attorney and was sentenced to a longer term of 180 days. *Id.* Based on the specific facts of that case, the Ninth Circuit found that the petitioner's plea was involuntary to the extent he did not receive the sentence for which he bargained. *Id.* Here, Petitioner does not argue, much less demonstrate, that the Board's characterization of the crime to which she pleaded guilty in the Hinman case as a "mutilation" crime in a subsequent parole suitability hearing was a direct consequence of her guilty plea, as was the case in *Carter* with respect to a mandatory parole term. Nor does she argue that she did not receive the sentence for which she bargained or that the specific circumstances of her guilty plea are similar to those presented in *Chizen* such that the case applies here.

would cease arguing on a given date that the commitment offense was especially callous and concluding that, absent such evidence, the petitioner "cannot establish that his continued incarceration is a breach of his bargain"); *cf. Buckley*, 441 F.3d at 699 (a federal habeas court may grant specific performance of a plea agreement in the face of evidence that the state has breached the terms of such an agreement); *Brown*, 337 F.3d at 1159–62 (ordering specific performance of plea agreement where prosecutor made express promise that petitioner would serve only half of minimum term if she remained discipline free, and petitioner fulfilled her side of the bargain).

Moreover, the Board was not a party to the plea agreement. In fact, it was reasonable to expect that the Board would have reviewed and considered the underlying facts of Hinman's death. As discussed *infra*, the Board is entitled to consider the nature of Petitioner's commitment offense in determining Petitioner's suitability for parole. *See* Cal.Code Regs., tit. 15, § 2281(b), (c)(1) (in considering the prisoner's commitment offense as a circumstance tending to indicate unsuitability, the Board may consider whether "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense"). Thus, Petitioner's expectations of what the Board should consider in parole hearings are unrelated to the guilty plea. *See Wheeler*, 352 F.Supp.2d at 1094; *Buckley*, 441 F.3d at 695.

The Court cannot conclude that the California courts' denials of Petitioner's plea violation claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or were based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Claim Five, therefore, does not warrant federal habeas relief.[11]

11. In her Objections, Petitioner argues that, with respect to Claims One, Two, Three and Five, "when a State Court does not address the grounds of a petition at all it *automatically* satisfies the exception to the AEDPA" under 28 U.S.C. Section 2254(d)(1). (*See* Objections at 3). Petitioner cites to *Buckley* in support of her argument. In *Buckley*, the Ninth Circuit determined that at the time the California Supreme Court summarily denied the petitioner's most recent state habeas petition, in March 1999, "it had been clearly established federal law for more than a decade that the construction and interpretation of state court plea agreements 'and the concomitant obligations flowing therefrom are, within broad bounds of reasonableness, matters of state law.'" 441 F.3d at 694–95 (quoting *Ricketts v. Adamson*, 483 U.S. 1, 6 n. 3, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987)). The Ninth Circuit concluded that, "under *Adamson*, California courts are required to construe and interpret plea agreements in accordance with state contract law." *Buckley*, 441 F.3d at 695. Thus, because the Ventura County Superior Court had not only failed to apply California contract law properly in its decision denying the petitioner's plea agreement claim, but failed to apply it at all, the Ninth Circuit concluded that the superior court's decision was contrary to clearly established federal law. *See id.* at 693, 695 & n. 5.

Petitioner's reliance on *Buckley* is misplaced. In *Buckley*, the Ninth Circuit did not, as Petitioner appears to suggest, hold that a state court's failure to address the grounds of a petition automatically renders the state court's decision contrary to clearly established federal law. Unlike this case, where there is no reasoned decision addressing the merits of Claims One, Two, Three and Five, in *Buckley*, the Ventura County Superior Court had provided a reasoned decision addressing and rejecting the petitioner's claim, but the superior court's decision was "contrary to" clearly established law because it failed to apply state contract law analysis at all. *See id.* at 693, 695 & n. 5. The Ninth Circuit did

## II. THE BOARD'S 2005 DENIAL OF PAROLE DID NOT VIOLATE PETITIONER'S RIGHT TO DUE PROCESS

Petitioner raises several due process claims in the instant Petition. In Claim One, Petitioner contends that her parole process was arbitrary because the Board intentionally violated the law, falsified information, and used Petitioner's thirty-six year-old conviction. (*See* Petition at 5, "Additional Page"; Reply at 8–16, 22). In Claim Two, Petitioner contends that the Board's actions violated substantive due process by intentionally subverting the parole process. (*See* Petition at 5; Reply at 17, 23). In Claim Three, Petitioner contends that she was not given access to the materials used against her. (*See* Petition at 6; Reply at 4, 18). In Claim Four, Petitioner contends that the use of Petitioner's commitment offense thirty-six years later without explaining how it was relevant to Petitioner's present risk of danger to society did not satisfy the "some evidence" standard. (*See* Petition at 6; Reply at 7, 18–20, 23). For the reasons set forth below, Petitioner's claims do not warrant federal habeas relief.

### A. Petitioner Has A Liberty Interest In Parole

■ While there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," *Greenholtz v. Inmates of Nebraska Penal,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when or unless certain designated findings are made, and thereby give rise to a constitutionally protected liberty interest. *See Bd. of Pardons v. Allen,* 482 U.S. 369, 376–78, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (Montana parole statute providing that board "shall" release prisoner, subject to certain restrictions, creates due process liberty interest in release on parole); *Greenholtz,* 442 U.S. at 11–12, 99 S.Ct. 2100 (Nebraska parole statute providing that board "shall" release prisoner, subject to certain restrictions, creates due process liberty interest in release on parole). In such a case, a prisoner gains a legitimate expectation in parole that cannot be denied without adequate procedural due process protections. *See Allen,* 482 U.S. at 373–81, 107 S.Ct. 2415; *Greenholtz,* 442 U.S. at 11–16, 99 S.Ct. 2100.

■ The Ninth Circuit has held that as a matter of "clearly established" United States Supreme Court law, California's parole scheme, which uses mandatory language and is "largely parallel" to the schemes found in *Greenholtz* and *Allen,* gives rise to a cognizable liberty interest in release on parole. *McQuillion v. Duncan,* 306 F.3d 895, 901–02 (9th Cir.2002). In California, "[t]he panel or board ... shall set a release date unless it determines that

not find that the California Court of Appeal's or California Supreme Court's denials of the petitioner's state habeas petitions were contrary to clearly established federal law because they were summary in nature, or otherwise failed to address the petitioner's claim, but, instead, focused its analysis on the deficiencies of the superior court's reasoned decision rejecting the petitioner's plea agreement claim. *See id.* at 693, 695–97; *see also Brown,* 337 F.3d at 1160 n. 2 (noting that California Court of Appeal's decision involved an objectively unreasonable application of

*Santobello* due to its "unnecessary and improper inquiry into Brown's subjective intent," which contravened state contract law, which would bar consideration of such extrinsic evidence gleaned many years after the plea); *id.* at 1162–63 (Silverman, J., dissenting) (discussing and quoting California Court of Appeal's reasoned decision denying plea agreement claim). In any event, the Court notes that, even under a *de novo* standard of review, Petitioner's claim regarding her plea agreement does not warrant federal habeas relief.

the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offenses or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.Penal Code § 3041(b). The scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made. *McQuillion,* 306 F.3d at 902. The Ninth Circuit has found that section 3041 of the California Penal Code vests all California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process clause. *Irons v. Carey,* 505 F.3d 846, 850 (9th Cir.2007) (as amended), *reh'g denied,* 506 F.3d 951 (2007); *see also Sass v. Cal. Bd. of Prison Terms,* 461 F.3d 1123, 1128 (9th Cir.2006) (petitioner has a constitutionally protected liberty interest in a parole date); *Biggs v. Terhune,* 334 F.3d 910, 914–15 (9th Cir.2003) (affirming that an inmate has a constitutionally protected liberty interest in release on parole).

### B. *Scope of Due Process Protection*

 Because parole-related decisions are not considered part of a criminal prosecution, the "full panoply of rights" due a defendant in a criminal proceeding is not constitutionally mandated in a parole proceeding, even when a protected liberty interest exists. *Jancsek v. Oregon Bd. of Parole,* 833 F.2d 1389, 1390 (9th Cir.1987); *Pedro v. Oregon Parole Bd.,* 825 F.2d 1396, 1399 (9th Cir.1987), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988). In general, due process is satisfied in the context of a hearing to set a parole date where the prisoner is provided with notice of the hearing, an opportunity to be heard, and, if parole is denied, a statement of the reasons for the denial. *See Jancsek,* 833 F.2d at 1390 (citing *Greenholtz,* 442 U.S. at 16, 99 S.Ct. 2100). Violation of state mandated procedures constitutes a federal due process violation only if the violation causes a fundamentally unfair result. *See Estelle v. McGuire,* 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

In addition to these procedural protections at the parole hearing, there must be an evidentiary basis for the parole board's decision to deny parole. In *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the United States Supreme Court held that due process requires that a disciplinary board's decision to revoke a prisoner's good time credits must be supported by "some evidence." *Id.* at 455–56, 105 S.Ct. 2768. Reasoning that a parole decision, like the accumulation of good time credits, directly affects the duration of the prison term, the Ninth Circuit has held that the "some evidence" standard set forth in Hill applies in the parole context. *Jancsek,* 833 F.2d at 1390–91; *see Irons,* 505 F.3d at 851; *Sass,* 461 F.3d at 1128–29; *Biggs,* 334 F.3d at 915; *McQuillion,* 306 F.3d at 904.[12]

12. Respondent contends that use of the "some evidence" standard in the parole context is not clearly established by the Supreme Court for AEDPA purposes. Specifically, Respondent contends that the Supreme Court has never held that some evidence must support a parole decision and, thus, due process does not require the Board to specify *any evidence* in support of a parole decision. According to Respondent, *Greenholtz* constitutes the only clearly established Supreme Court law addressing parole decisions and, although this Court is bound by Ninth Circuit precedent, the Supreme Court's decision in *Carey v. Musladin,* 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006), effectively overruled Ninth Circuit decisions evaluating parole decisions under the "some evidence" standard as derived from *Hill.* (*See* Answer at 13–17). *See generally Musladin,* 549 U.S. at 77, 127 S.Ct. 649 ("Given the lack of holdings from

■ To meet the "some evidence" standard, the evidence relied upon must bear "some indicia of reliability." *Biggs,* 334 F.3d at 915 (quoting *Jancsek,* 833 F.2d at 1390). Determining whether the "some evidence" standard was met does not require examination of the entire record, independent assessment of the credibility of the witnesses, or the weighing of evidence. *Hill,* 472 U.S. at 455, 105 S.Ct. 2768; *Sass,* 461 F.3d at 1128. The "some evidence" standard is "minimally stringent," and is met "if there is *any* evidence in. the record that *could* support the conclusion reached by the . . . board." *Powell v. Gomez,* 33 F.3d 39, 40 (9th Cir.1994) (emphasis in original and internal quotation marks omitted); *see Sass,* 461 F.3d at 1128–29 (parole denial justified if "there is any evidence in the record that could support the conclusion reached by the [ ]

this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' [28 U.S.C.] § 2254(d)(1). No holding of this Court required the California Court of Appeal to apply the test of *Williams* and *Flynn* to the spectators' conduct here. Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law."). Respondent contends that *Musladin* is clearly irreconcilable with Ninth Circuit precedent because *Musladin* prevents a court from inferring clearly established federal law where the case at bar is factually distinguishable from the Supreme Court case. (*See* Answer at 15–16 (citing *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir.2003) (en banc) ("We hold that the issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.")))). Thus, Respondent argues that this Court cannot apply the "some evidence" test of *Hill* by analogizing a parole denial to a good time credit revocation. (*See* Answer at 16).

As noted above, in *Hill,* the Supreme Court held that due process requires that a disciplinary board's decision to revoke a prisoner's good time credits must be supported by "some evidence." *See Hill,* 472 U.S. at 455–56, 105 S.Ct. 2768. Reasoning that a parole decision, like the accumulation of good time credits, directly affects the duration of the prison term, the Ninth Circuit has held that the "some evidence" standard set forth in *Hill* applies in the parole context. *Jancsek,* 833 F.2d at 1390–91. While the "some evidence" standard for parole dates as established and applied in *Jancsek, McQuillion, Biggs, Sass* and *Irons* is Ninth Circuit law and, thus, only persuasive authority, this Court is nonetheless persuaded that in those holdings, the Ninth Circuit accurately interpreted and applied the well-established Supreme Court law created by *Hill,* and that *Musladin* and the Ninth Circuit case law are not "of such clear irreconcilability" such that Ninth Circuit precedent should be rejected as effectively overruled. *See Miller,* 335 F.3d at 900 ("In future cases of such clear irreconcilability, a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled."); *Crawford v. Hartley,* 2008 U.S. Dist. LEXIS 64022, at *16 n. 8 (C.D.Cal. Aug. 13, 2008); *De Boes v. Sisto,* 2007 U.S. Dist. LEXIS 96451, at *15 n. 5 (C.D.Cal. Dec. 21, 2007); *see also Avila v. Scribner,* 2008 WL 5411463, at *5–6 (S.D.Cal. July 7, 2008) (recommending rejection of Respondent's argument that the "some evidence" standard of *Hill* does not apply in the parole context because "the holdings of *Musladin* and [*Schriro v.*] *Landrigan* [, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) ] are not 'clearly irreconcilable' with *Sass* and *Irons*" for at least two reasons: *Musladin* and *Landrigan* "interpret the phrase 'clearly established federal law' under the same standard as the Ninth Circuit in *Sass,* and reasonable jurists can disagree with the application of that standard in any given context" and "the Supreme Court in *Hill* in fact applied the 'some evidence' standard to hearings held in custodial settings that affect the duration of a prisoner's sentence"), *adopted in part and rejected in part,* 2008 WL 5432280 (S.D.Cal. Dec. 22, 2008). Accordingly, unless or until the Ninth Circuit overrules its earlier holdings in *Jancsek, McQuillion, Biggs, Sass* and *Irons,* this Court remains bound by those decisions.

board"). The "some evidence" standard "assures that 'the record is not so devoid of evidence that the findings of the [ ] board were without support or otherwise arbitrary.'" *Sass,* 461 F.3d at 1129 (quoting *Hill,* 472 U.S. at 457, 105 S.Ct. 2768).

## C. *California's Parole Scheme*

Under California law, eligible prisoners are considered for parole at a suitability hearing before a panel of the Board. Cal.Penal Code § 3041.5(a). Prisoners are entitled to be present at the hearing, to ask questions, and to speak on their own behalf. Cal.Penal Code § 3041.5(a)(2). Prisoners serving a life sentence are entitled to be represented by counsel. Cal.Penal Code § 3041.7. The Board must determine "whether the life prisoner is suitable for release on parole." Cal.Code Regs., tit. 15, § 2281(a). If the Board finds the prisoner suitable for parole, it sets a parole date. A parole release date must be set unless the panel determines that the "gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

is such that consideration of the public safety requires a more lengthy period of incarceration[.]" Cal.Penal Code § 3041(b).

In considering whether a prisoner is suitable for parole, the Board must consider "[a]ll relevant, reliable information." Cal.Code Regs., tit. 15, § 2281(b). Such information includes the prisoner's social and criminal history, her mental state, and her commitment offense and attitude towards the offense. *Id.* Circumstances indicating unsuitability include: the commitment offense was committed in an especially heinous, atrocious, or cruel manner; a previous record of violence; an unstable social history; sadistic sexual offenses; psychological factors; and serious misconduct in prison. Cal.Code Regs., tit. 15, § 2281(c).[13] Circumstances indicating suitability include: no juvenile record; a stable social history; signs of remorse; motivation for the crime; lack of criminal history; the prisoner's age and plans for the future; and the prisoner's conduct in prison. Cal.Code Regs., tit. 15,

---

**13.** Cal.Code Regs. tit. 15, § 2281(c) provides:

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
 (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
 (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
 (C) The victim was abused, defiled or mutilated during or after the offense.

 (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
 (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
(2) Previous record of violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

§ 2281(d).[14] Regardless of the length of time served, a life prisoner must be found unsuitable and denied parole if, in the judgment of the panel, he or she will pose an unreasonable risk of danger to society if released. Cal.Code Regs., tit. 15, § 2402(a).

### D. *The Board's June 1, 2005 Decision Denying Parole*

The Board found that Petitioner was unsuitable for parole due to the nature of her commitment offenses. (*See* Respondent's Lodgment No. 7 at 157). Specifically, the Board stated:

> [T]he panel reviewed all information received from the public and relied on the following circumstances in concluding that you are not suitable for parole and . . . would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The first and foremost issue that we took into consideration is the gravity of the offense. A review of the record indicates that the offense was carried out in an especially cruel and callous manner, in

that the victims in this case were shot and/or stabbed multiple times, to include the stabbing death of a pregnant Sharon Tate. Multiple victims, specifically eight, were attacked and killed in three separate incidents. The offense was carried out in a dispassionate and calculated manner in that all the facts in this case suggest premeditation to an extent. Some of the victims in this case were abused and mutilated in that one of the victims had his ear cut off and numerous other victims were stabbed to death over a period of time. The murder of the first victim, Mr. Hinman, on July 25, 1969, did not deter you from later committing additional offenses. It should be noted that Mr. Hinman was stabbed repeatedly over a period of time. One of his ears was cut off and he subsequently died as a result of a stab wound from—a stab wound to the heart after a lengthy period of time. The motive for that particular crime was trivial in that it appears that it was committed for the purpose of robbery. These conclusions are drawn from the Statement of Facts,

---

**14.** Cal.Code Regs. tit. 15, § 2281(d) provides, in pertinent part:

> (d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:
>
> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
>
> (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating

> that he understands the nature and magnitude of the offense.
>
> (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
>
> (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome . . . and it appears the criminal behavior was the result of that victimization.
>
> (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
>
> (7) Age. The prisoner's present age reduces the probability of recidivism.
>
> (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>
> (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

wherein according to the record, you and your co-defendants, known as The Manson Family, on or about July 25th, 1969, caused the deaths—death of Mr, Hinman by repeated stabbings. On August 9th, 1969, members of The Manson Family, to include yourself . . . went to the home of Sharon Tate and proceeded to murder the victims. Specifically, Ms. Folger, Mr. Frykowski, Mr. Parent, Ms. Polanski and Mr. Sebring. The victims were killed via gunshot and/or multiple stab wounds demonstrating an extremely high level of violence and savagery in the commission of these crimes. During or after the murder, the words "PIG" were written on the wall or door utilizing blood of one of the victims in an apparent effort to incite a race war.

(Respondent's Lodgment No. 7 at 157–58).

The Board also denied Petitioner parole for an additional four years in a separate decision, stating:

[T]he reasons for the four year denial, the main reason is the gravity of the offense. According to the record, the offense was carried out in an especially cruel and callous manner in that the victims in this case were shot and/or stabbed multiple times to include the stabbing death of an eight and a half month pregnant Sharon Tate. Multiple victims, specifically eight were attacked and killed in three separate incidents in the sanctity of their homes. The offense was carried out in a dispassionate and calculated manner in that the facts of this case suggest premeditation. The victims were abused and mutilated during and/or after the offense in that one victims had his ear cut off and numerous other victims were shot and/or stabbed to death over a period of time. The motive for the crime, the first crime, the death of Mr. Hinman was very trivial in relationship to the offense in that he was murdered for the purpose of money. The murder of the first victim, Mr. Hinman, did not deter the prisoner from later committing other offenses. Mr. Hinman's death it is noted resulted from multiple stab wounds over a period of time and his death subsequently occurred as a result of a stab wound to the heart after having had his ear cut off. These conclusions are drawn from the Statement of Facts[.] . . . A review of the record indicates that you have an unstable social history and prior criminal arrests, which includes arrests. You have one conviction for possession of marijuana and you have arrests for receiving stolen property, possession of a concealed weapon, reproducing [a] driver's license, possession of dangerous drugs, use by a minor, and grand theft. You also have extensive use—a history of extensive use of narcotics to include LSD, marijuana, hashish and methamphetamine. It's important to note that the psychiatric report dated January 3rd of 2005, written by Staff Psychologist Robert Smith is somewhat inconclusive. And the reason I state that is because if you look at page six of the most recent report, Dr. Smith writes, these crimes are horrific and are well beyond what is common in our community. Inmate Atkins does admit responsibility and she offers what appears to be credible expressions of insight and remorse. Complete assurance of her acceptance of responsibility, insight and remorse will probably always be clouded somewhat by the factual disputes that stem from her earlier versions of the crime. We do note for the record, ma'am that you do appear to have realistic parole plans with your husband[.] And it does appear that you do have acceptable employment plans; again, as a paralegal in the business of your husband. In addition, you also have marketable skills that you would be able to utilize upon your release to parole. You have a paralegal

certification that you would be able to put to use. You have completed word processing courses and you have worked for an extended period of time as a clerk within the institutions and as a receptionist that would appear to provide you with the skills necessary to obtain that type of employment on the outside. The Hearing Panel notes that responses to Penal Code Section 3042 indicate an opposition to a finding of suitability by the District Attorney of Los Angeles County, the Los Angeles County Sheriff's Department, the Los Angeles Police Department and numerous or a number of victims' next of kin. The Panel makes the following findings: And that is that you need further therapy in order to develop insight into the commitment offense and the underlying cause of the offense. Nevertheless, we would like to take this opportunity to commend you for a variety of things. First of all, we'd like to commend you for your completion of your AA and for being very close to completing your BS. We do encourage you to complete that. We'd also like to commend you for your extensive participation in AA, NA, Breaking Barriers, CODA [ ], Bible Study Fellowship, Sharing Our Stitches, Mexican American Resource Association, the African American Women Prisoners Association and a variety of other programs that you have participated during your length incarceration within the California Department of Corrections. However, these positive aspects of your behavior do not outweigh the factors of unsuitability. And as a result, we will deny you at this point for four years.

(Respondent's Lodgment No. 7 at 159–64). The Board requested that the Department of Corrections conduct another psychological evaluation for Petitioner's next parole hearing, and, in particular, asked for an evaluation of Petitioner's violence potential in the community, her insight into the crime, and the extent to which Petitioner had come to terms with the underlying cause of the commitment offense, the significance of drugs in the commitment offense, and an estimate of her ability to refrain from using substances in the future. (Respondent's Lodgment No. 7 at 164). Finally, the Board told Petitioner to "continue doing exactly what you've been doing recently" by remaining disciplinary free, taking advantage of available self-help, therapy and vocational programs, and continuing to maintain a positive attitude. (*Id.*).

### E. *"Some Evidence" Supports The Board's Decision*

■■■■ In denying parole for Petitioner, the Board found that Petitioner would pose an unreasonable risk of danger to society or threat to public safety if she were released from prison. The "first and foremost issue" that the Board took into consideration was the "gravity of the offense." (*See* Respondent's Lodgment No. 7 at 157–59). Under California law, the nature of a prisoner's offense alone can constitute a sufficient basis for denying parole. *See In re Rosenkrantz,* 29 Cal.4th 616, 682–83, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002) ("Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant."); *see also Sass,* 461 F.3d at 1129 (unchanging factors, such as the gravity of the commitment offense and conduct prior to imprisonment, may serve as "some evidence" for a denial of parole). Under the applicable California parole regulations, factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner, and thus

is unsuitable for parole, include: (1) that multiple victims were attacked, injured or killed in the same or separate incidents; (2) that the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) that the victim was abused, defiled or mutilated during or after the offense; (4) that the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (5) that the motive for the crime was inexplicable or trivial in relation to the offense. *See Rosenkrantz*, 29 Cal.4th at 654 n. 11, 128 Cal.Rptr.2d 104, 59 P.3d 174; Cal.Code Regs., tit. 15, §§ 2402(c)(1)(A)-(E), 2281(c)(1)(A)-(E). The commitment offense may provide some evidence that a prisoner is presently too dangerous to be found suitable for parole where the Board "can point to factors beyond the minimum elements of the crime" that demonstrate the inmate poses a present danger to society if released. *See Irons*, 505 F.3d at 851–52; *In re Dannenberg*, 34 Cal.4th 1061, 1095 n. 16, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005); *see also* Cal.Penal Code § 3041(b) (the Board may deny a parole release date if it determines that "the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual"). "Factors beyond the minimum elements of the crime include, *inter alia*, that '[t]he offense was carried out in a dispassionate and calculated manner,' that '[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering,' and that '[t]he motive for the crime is inexplicable or very trivial in relation to the offense.'" *Irons*, 505 F.3d at 852 (quoting Cal.Code Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)).

The Ninth Circuit's holding in *Biggs* provides additional guidance on this point.

After Biggs's employer was charged with grand theft arising out of the company's trafficking in stolen computer parts, a witness planning to testify against the employer was bludgeoned to death. Biggs did not personally kill the victim, but he helped lure the victim to his death, was present during the killing, paid money to the conspirators, and helped conceal the body. *Biggs*, 334 F.3d at 912. The Ninth Circuit affirmed the district court's conclusion that there was no evidence in the record to support the Board's findings that Biggs had an escalating pattern of criminal conduct, he was not remorseful for his actions, he failed to profit from previous attempts to correct his criminality, and his gains were "recent." *Id.* at 915–16. Nonetheless, the Ninth Circuit held that the circumstances of the murder exhibited a "callous disregard for life," and constituted "some evidence" supporting the Board's decision that Biggs was unsuitable for parole. *Id.* at 916.

In this case, unlike in *Biggs*, Petitioner personally participated in the killing of multiple victims. There is evidence that Petitioner and other members of the Manson Family went to Gary Hinman's home on July 25, 1969, and Petitioner knowingly participated in his killing. (*See* Respondent's Lodgment No. 4 at 6–7, 8, 9, 11; Respondent's Lodgment No. 5). Hinman was cut and stabbed repeatedly over the course of several days and suffered a stab wound to the heart. (*See* Respondent's Lodgment No. 5; Respondent's Lodgment No. 6 at 2, 4). Hinman's ear was cut off with a sword and a gaping wound was inflicted on the side of his face. (*See* Respondent's Lodgment No. 6 at 4). Petitioner admitted to using a pillow to muffle or cut off Hinman's breath, wiping his house down for fingerprints after he died, and removing garbage and bandages used to bandage him. (*See* Respondent's Lodgment No. 4 at 8–9, 12). On August 9, 1969, Petitioner personally participated in

the deaths of five additional victims at the Tate residence, wherein each victim was shot and/or stabbed multiple times and Petitioner soaked a towel in a victim's blood and wrote words on the wall. (*See* Respondent's Lodgment No. 2 at 7; Respondent's Lodgment No. 6 at 2–3, 4–5). In light of the foregoing, the Los Angeles Superior Court reasonably concluded that "some evidence" supports the Board's finding that Petitioner was unsuitable for parole based on its findings that Petitioner's commitment offense was carried out in an "especially cruel and callous manner" and multiple victims were killed in the same and separate incidents. (*See* Respondent's Lodgment No. 7 at 157; Respondent's Lodgment No. 9 at 1–2). Further, the superior court reasonably concluded that there was "some evidence" to support the Board's parole suitability determination based on its finding that the murders were committed with an "extremely high level of violence and savagery" and, thus, in a manner demonstrating an "exceptionally callous disregard for human suffering" in that they were committed in a "more aggravated or violent manner than that ordinarily shown in the commission of that offense." (*See* Respondent's Lodgment No. 7 at 158; Respondent's Lodgment No. 9 at 2). As the Ninth Circuit has observed, "*Hill'* s some evidence standard is minimal," *Sass,* 461 F.3d at 1129; *see Hill,* 472 U.S. at 457, 105 S.Ct. 2768 (even "meager" evidence satisfies the "some evidence" standard such that the "the record is not so devoid of evidence that the findings of the [ ] board were without support or otherwise arbitrary"), and is met "if there is *any* evidence in the record that *could* support the conclusion reached by the ... board." *Powell,* 33 F.3d at 40 (emphasis in original).

Petitioner, however, claims that the Board's use of her commitment offense thirty-six years afterward, without explanation as to how it was relevant to her present risk to society, did not satisfy the "some evidence" standard. (*See* Petition at 6; Reply at 7, 18–20). Specifically, Petitioner argues that "the mere re-statement of a commitment offense does not satisfy the Constitutional requirement for 'some evidence' that parole would present an unreasonable risk to society at the present time." (Reply at 19).

In *Biggs,* the Ninth Circuit indicated that the value of the criminal offense fades over time as a predictor of parole suitability, and "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 916–17 (citation omitted). The Ninth Circuit ultimately found that Biggs' commitment offense constituted "some evidence" supporting the denial of parole at his first suitability hearing, but cautioned that, "[o]ver time ... should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." *Biggs,* 334 F.3d at 916.

Subsequently, in *Sass,* the Ninth Circuit held that due process was not violated when the inmate was found unsuitable for parole based on his commitment offense and prior offenses. *Sass,* 461 F.3d at 1125–26, 1129. The Ninth Circuit acknowledged the *Biggs* language regarding continued reliance on unchanging factors, but declared: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." *Id.* at 1129. In *Irons,* the Ninth Circuit reversed the district court's *Biggs*-based grant of habeas relief and held that, despite the "substantial evidence in the record demonstrating rehabilitation," the

facts of Irons's conviction offense constituted "some evidence" sufficient to support the parole board's decision finding him unsuitable for parole. *Irons,* 505 F.3d at 849, 853–54. Observing that Irons, like Biggs and Sass, had not yet served the minimum term of his sentence at the time of his parole hearing, the Ninth Circuit declared: "All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." *Id.* at 853–54. The Ninth Circuit expressed a hope that "the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process." *Irons,* 505 F.3d at 854.

The dicta in *Biggs* is not clearly established law as set forth by the United States Supreme Court. Thus, the state court's refusal to adopt *Biggs* is not a decision that is contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. *See* 28 U.S.C. § 2254(d); *Cass v. Woodford,* 432 F.Supp.2d 1061, 1064–66 (S.D.Cal.2006); *see Lucero v. Mendoza-Powers,* 2008 WL 4661617, at *12–14, 2008 U.S. Dist. LEXIS 84585, at *34–38 (C.D.Cal. Oct. 21, 2008); *Fernandez v. Kane,* 2006 WL 3041083, at *2–3, 2006 U.S. Dist. LEXIS 81068, at *6–8 (N.D.Cal. Oct. 24, 2006); *Boatman v. Brown,* 2005 U.S. Dist. LEXIS 9891, at *29–30 (N.D.Cal. May 18, 2005); *Siller v. Brown,* 2005 U.S. Dist. LEXIS 9370, at *29–30 (N.D.Cal. May 6, 2005); *see also Perez v. Curry,* 2008 WL 5135138, at *5, 2008 U.S. Dist. LEXIS 101578, at *15 (N.D.Cal. Dec. 8, 2008) ("In any event, even assuming for

purposes of this discussion that *Biggs* and *Irons* recognized an abstract due process right not to have parole repeatedly denied on the basis of the facts of one's crime and one's criminal history, and in the face of extensive evidence of rehabilitation, and also assuming arguendo that the right was violated in petitioner's case, petitioner still cannot obtain relief on this theory, because as there is no clearly-established United States Supreme Court authority recognizing a '*Biggs* claim.' The state courts' rulings therefore could not be contrary to, or an unreasonable application of, clearly-established Supreme Court authority within the meaning of 28 U.S.C. § 2254(d)(1)."). Indeed, the Ninth Circuit has recognized that "[t]here is no 'clearly established' federal law as determined by the Supreme Court of the United States that limits the number of times a parole board may deny parole to a murderer based on the brutality and viciousness of the commitment offense," and that "[t]he dicta in Ninth Circuit cases like *Biggs v. Terhune,* 334 F.3d 910, 916–17 (9th Cir.2003), are not holdings of the Supreme Court, as required by *Carey v. Musladin,* 549 U.S. [70, 73–77, 127 S.Ct. 649, 166 L.Ed.2d 482] (2006), and *Schriro v. Landrigan,* [550 U.S. 465, 127 S.Ct. 1933, 1941–43, 167 L.Ed.2d 836 (2007) ]." *Culverson v. Davison,* 237 Fed. Appx. 174, 175 & n. 5 (9th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 2475, 171 L.Ed.2d 770 (2008).[15]

Moreover, the little guidance that has come from the Supreme Court suggests that the "some evidence" standard is extremely deferential to the original decision-maker. *See Hill,* 472 U.S. at 454–55, 105 S.Ct. 2768 (examination of the entire record is not required, nor is an independent assessment of the credibility of witnesses or weighing of the evidence; the relevant question is whether there is any

---

**15.** The Court may cite unpublished Ninth Circuit opinions issued on or after January 1, 2007. 9th Cir. Rule 36–3(b); Fed. R.App. P. 32.1(a).

evidence in the record that could support the conclusion reached by the decision-maker). The Supreme Court's comments also suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. *See Greenholtz*, 442 U.S. at 13, 99 S.Ct. 2100. Prediction "requires the Board to assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice." *Id.* at 8, 99 S.Ct. 2100. To the extent that here, Petitioner would argue that her commitment offense, committed thirty-six years prior to the Board's decision denying

parole, "no longer has any bearing on the predictive decision the [Board] must make[,] ... criminal conduct is not some arbitrary factor like eye color that has nothing to do with present dangerousness. Recidivism concerns are genuine." *Siller*, 2005 U.S. Dist. LEXIS 9370, at *31 (citing *Ewing v. California*, 538 U.S. 11, 26, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (O'Connor, J.)); *see Boatman*, 2005 U.S. Dist. LEXIS 9891, at *30 (same). "California's parole scheme does not offend due process by allowing the [Board] to predict that an inmate presents a present danger based on a murder" she committed decades ago.[16] *See Siller*, 2005 U.S. Dist. LEXIS 9370, at *31; *see also Thor v. Sisto*, 2008 WL

**16.** Petitioner argues that the Los Angeles County Superior Court's "assertion that a commitment offense may be used as some evidence if it shows a certain level of violence does not satisfy the 'some evidence' rule unless the Board (1) studies the facts to determine the violence shown by the *individual inmate* ... and (2) explains how this violence is relevant to the issue of present or continuing risk to society," and neither the Board nor the superior court attempted to do this. (Reply at 19–20; *see* Reply at 7–8, 23). The Court rejects Petitioner's argument. Although Petitioner cites to Cal.Code Regs., tit. 15, § 2236 ("The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability.") and the Los Angeles County Superior Court's order citing to *Rosenkrantz*, 29 Cal.4th at 683, 128 Cal.Rptr.2d 104, 59 P.3d 174 (the parole authority "may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant"), Petitioner cites no federal authority, much less clearly established United States Supreme Court authority, requiring an explanation beyond those given by the Board and the superior court. (*See* Reply at 19–20 & nn. 4, 5). *Cf. Greenholtz*, 442 U.S. at 14–16, 99 S.Ct. 2100 (stating that, in determining the scope of protection applicable to a decision regarding whether to release an inmate on parole, "[p]rocedures designed to elicit specific facts, such as those required in *Morrissey* [*v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation procedures)], *Gagnon* [*v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36

L.Ed.2d 656 (1973) (parole revocation procedures)], and *Wolff* [*v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (disciplinary hearing)], are not necessarily appropriate to a Nebraska parole determination" and holding that a statement of the particular evidence supporting the Board's discretionary determination that an inmate is not ready for conditional release is not required to satisfy due process, despite the fact that *Wolff* requires a statement of supporting evidence); *Irons*, 505 F.3d at 851–52 (stating that "[t]he Board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability'" and that "the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released," such as whether the offense was carried out in a dispassionate and calculated manner, the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime is inexplicable or very trivial in relation to the offense).

Accordingly, to the extent Petitioner claims the Board violated state law or regulations, Petitioner fails to raise a cognizable federal habeas claim and is not entitled to habeas relief. *See Estelle*, 502 U.S. at 67–68, 112

2949422, at *7, 2008 U.S. Dist. LEXIS 64928, at *19 (E.D.Cal. July 25, 2008) ("Under binding Ninth Circuit precedent, a commitment offense is some evidence that an inmate is unsuitable for parole, no matter how much time has passed since the offense occurred.").

In support of her claim, Petitioner relies in part on the Ninth Circuit's decision in *Hayward v. Marshall*, 512 F.3d 536 (9th Cir.2008). (*See* Reply at 7). In *Hayward*, the Ninth Circuit panel concluded that the gravity of the commitment offense had no predictive value regarding the petitioner's suitability for parole, and held that the Governor's reversal of parole was not supported by "some evidence" and resulted in a due process violation. 512 F.3d at 546–47. The Court also held that the *Hill* "some evidence" standard requires evidence that an inmate's release would unreasonably endanger public safety. *Id.* at 543–44. Thereafter, the Ninth Circuit granted *en banc* review and ordered that "the three-judge panel opinion [in *Hayward*] shall not be cited as precedent by or to any court of the Ninth Circuit." *See Hayward v. Marshall*, 527 F.3d 797 (9th Cir.2008).[17] On August 21, 2008, the California Supreme Court issued *In re Law-*

*rence*, 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008), and its companion case, *In re Shaputis*, 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573 (2008). In *Lawrence*, the California Supreme Court held that "the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board." 44 Cal.4th at 1221, 82 Cal.Rptr.3d 169, 190 P.3d 535 (emphasis in original). Similarly, in *Shaputis*, the California Supreme Court stated that, in determining whether an inmate poses a current danger, "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." 44 Cal.4th at 1254–55, 82 Cal.Rptr.3d 213, 190 P.3d 573 (citations omitted).

In both these cases, however, the state supreme court decided issues of state court review of parole decisions as a matter of state law.[18] Those decisions are not

S.Ct. 475 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Chan v. Kane*, 272 Fed.Appx. 632, 633–34 (9th Cir.2008) ("Chan's contentions that the Board's decision violated California parole law are questions of state law that we will not review here.") (citations omitted).

17. The *en banc* hearing in *Hayward* was held on June 24, 2008. Thereafter, the Ninth Circuit ordered supplemental briefing regarding *Lawrence* and *Shaputis*.

18. In her Objections, Petitioner argues that the California Supreme Court based its decision in *Lawrence* on a determination of feder-

al due process rights. (Objections at 5 & n. 3). In support of this argument, Petitioner cites to a single sentence in *Lawrence* in which the California Supreme Court quoted its earlier decision in *Rosenkrantz*: "Accordingly, '[r]equiring a modicum of evidence to support a decision ... will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens.'" *Lawrence*, 44 Cal.4th at 1205, 82 Cal.Rptr.3d 169, 190 P.3d 535 (quoting *Rosenkrantz*, 29 Cal.4th at 658, 128 Cal.Rptr.2d 104, 59 P.3d 174 (quoting *Hill*, 472 U.S. at 455, 105 S.Ct. 2768)) (internal quotation marks omitted). The sentence quoted by Petitioner, however, relates only to the California Supreme Court's adoption of the "some evidence" standard as the applicable standard for judicial review of decisions denying parole. *See Rosenkrantz*, 29 Cal.4th

binding on this court, and the Ninth Circuit has not yet issued an *en banc* decision in *Hayward*. *See Savignano v. Curry*, 2008 WL 4279548, at *6 (N.D.Cal. Sept. 11, 2008) ("Unless or until the *en banc* court overrules holdings of the earlier Ninth Circuit panel decisions in *Biggs*, *Sass* and *Irons*, these cases hold that California's parole scheme creates a federally protected liberty interest in parole and therefore a right to due process which is satisfied if some evidence supports the Board's parole

suitability decision."); *Chavez v. Martel*, 2009 WL 33427, at *1 n. 6 (E.D.Cal. Jan. 5, 2009) ("[I]n deciding *Lawrence*, the California Supreme Court was relying upon the California constitution and statutes. It does not appear from the opinion or the authorities cited that it was based upon Federal law as determined by the United States Supreme Court."); *Woo v. Powers*, 2008 WL 4361246, at *1 n. 1 (C.D.Cal. Sept. 15, 2008).[19] Accordingly, this Court is not bound by the state supreme court's

at 655–58, 128 Cal.Rptr.2d 104, 59 P.3d 174. Indeed, in *Rosenkrantz*, the California Supreme Court "conclude[d] *as a matter of California law* that the 'some evidence' standard of review is applicable to judicial review of a Board's decision denying parole" and expressly stated that it had "no occasion to determine whether the same standard is also mandated under federal constitutional principles." *See id.* at 658 n. 12, 128 Cal.Rptr.2d 104, 59 P.3d 174 (citation omitted) (emphasis added). The California Supreme Court noted that it had previously relied on the United States Supreme Court's decision in *Hill* to reject both an independent standard of review and a substantial evidence standard of review, *id.* at 656–57, 128 Cal.Rptr.2d 104, 59 P.3d 174, and, again, cited to *Hill* in rejecting an argument that the judicial review of parole decisions is limited to determining whether procedural safeguards have been observed. *Id.* at 658, 128 Cal.Rptr.2d 104, 59 P.3d 174 ("As the United States Supreme Court has recognized in a comparable setting, '[r]equiring a modicum of evidence to support a decision ... will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens.'" (quoting *Hill*, 472 U.S. at 455, 105 S.Ct. 2768). Thus, the court concluded that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by [California] statute and regulation." *Rosenkrantz*, 29 Cal.4th at 658, 128 Cal.Rptr.2d 104, 59 P.3d 174. Subsequently, in *Lawrence*, the California Supreme Court cited *Rosenkrantz* (quoting *Hill*) in discuss-

ing its previous rejection of the argument that the "judicial branch is authorized to review parole decisions only to ensure that all *procedural safeguards* have been satisfied, but not to consider the *merits* of a parole decision." *Lawrence*, 44 Cal.4th at 1204, 82 Cal.Rptr.3d 169, 190 P.3d 535 (citing *Rosenkrantz*, 29 Cal.4th at 657, 128 Cal.Rptr.2d 104, 59 P.3d 174). The Supreme Court noted that, in *Rosenkrantz*, it had "cautioned against a less stringent standard of review that would permit the Board to render a decision without any 'basis in fact' and not supported by any evidence in the record simply because 'the decision, on its face, recited supposed facts corresponding to the specified factors and appeared reasonable.'" *Id.* at 1204–05, 82 Cal.Rptr.3d 169, 190 P.3d 535 (quoting *Rosenkrantz*, 29 Cal.4th at 665, 128 Cal.Rptr.2d 104, 59 P.3d 174). "Such a decision would be arbitrary and capricious and, because it affects a protected liberty interest, would violate established principles of due process of law. Accordingly, '[r]equiring a modicum of evidence to support a decision ... will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens.'" *Id.* at 1205, 82 Cal.Rptr.3d 169, 190 P.3d 535 (quoting *Rosenkrantz*, 29 Cal.4th at 658, 128 Cal.Rptr.2d 104, 59 P.3d 174 (quoting *Hill*, 472 U.S. at 455, 105 S.Ct. 2768)) (internal quotation marks omitted).

**19.** The Court notes that a number of district court decisions have applied the "some evidence" standard as set forth in *Lawrence*, reasoning that because California law as set forth therein requires a focus on the inmate's current dangerousness, the federal habeas court must determine whether there is "some evidence" that the inmate's release would present a risk to public safety. *See, e.g.,*

decisions in either *Lawrence* or *Shaputis*. Because the Board's decision was supported by "some evidence," the Los Angeles County Superior Court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts presented. *See* 28 U.S.C. § 2254(d). Claim Four, therefore, does not warrant federal habeas relief.

### F. *Access to Materials*

■ In Claim Three, Petitioner argues that she was not given access to the materials used against her at her June 1, 2005 parole hearing. Specifically, Petitioner argues that the Board allowed the District Attorney to present evidence that was not in Petitioner's central file[20] during his closing statements, despite Petitioner's objections. (*See* Petition at 6; Reply at 4, 18).

Petitioner cites to *Pedro v. Oregon Parole Bd.*, 825 F.2d 1396, 1398 (9th Cir. 1987), in support of her claim. (*See* Reply at 18). In *Pedro*, the Ninth Circuit concluded that the petitioner had received all the process due under *Greenholtz* when the Board assigned to her a more serious subcategory of her crime severity rating. 825 F.2d at 1398, 1399. In reaching this conclusion, the Ninth Circuit stated:

> In *Greenholtz*, the Court noted that it is axiomatic that due process is flexible and calls for the procedural protections that particular situations demand. 442 U.S. at 12, 99 S.Ct. 2100. In the context

of a statute which, while creating a protected liberty interest, was "necessarily subjective in part," vesting "very broad discretion in the Board," *id.* at 13, 99 S.Ct. 2100, the Court held that due process did not require that every adverse parole decision include a statement of evidence relied on by the Board. [*Greenholtz*, 442 U.S.] at 15, 99 S.Ct. 2100. The Court explained that "to require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole release determination with a guilt determination." *Id.* at 15–16, 99 S.Ct. 2100. The Court rejected this approach, noting: "The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more." *Id.* at 16, 99 S.Ct. 2100. Thus, since the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists. *See Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *The petitioner in the instant case had a hearing with written advance notice of the date and time, she had an opportunity to be heard, she was represented by a paralegal, she had access to all mate-*

*Ochoa v. Marshall*, 2009 WL 86563, at *5 (C.D.Cal. Jan. 13, 2009); *Stallworth v. Muntz*, 2008 WL 5054698, at *13–14 (C.D.Cal. Nov. 25, 2008); *Ross v. Curry*, 2008 WL 4615440, at *3 (N.D.Cal. Oct. 17, 2008).

**20.** *See* Cal.Code Regs., tit. 15, § 2030(c) ("Prehearing Procedures. The prosecutor may review the prisoner's central file and submit any relevant documents including the

Appellant's and Respondent's Statements of the Case and Statements of Facts filed in any appeal that may have been taken from the judgment. Any information which is not already available in the central file shall be submitted in writing to department staff not later than ten days before the hearing. Failure to submit new information as provided in this section may result in exclusion of the information at the hearing.").

*rials considered by the Board, and she submitted materials for the Board's consideration.* The Board did not violate petitioner's expectation that, under the rules, a release date would be set within statutory guidelines and ranges; in this case, one of the two subcategories of severity category 7. Under *Greenholtz,* therefore, we conclude that the petitioner received all the process due. Her claim that due process requires the Board to articulate a standard definition of the term "significant planning and preparation" must therefore fail.

*Pedro,* 825 F.2d at 1398–99 (emphasis added); *see Jancsek,* 833 F.2d at 1390.

Here, Petitioner was afforded the procedural protections noted in *Pedro* and *Jancsek.* Petitioner does not dispute that she had advance notice of her June 1, 2005 hearing, she had an opportunity to be heard, was represented by counsel, and submitted materials for consideration by the Board. Rather, Petitioner argues that the Board allowed the Deputy District Attorney to present information during his closing statements that was not included in her central file. For example, he stated that when Petitioner was arrested in 1966, she was in the company of two companions who were driving a stolen car, she had a handgun, and she told the state trooper who arrested her, "I should have killed you." (Respondent's Lodgment No. 7 at 87). With respect to the murder of Gary Hinman, the Deputy District Attorney discussed the fact that Manson and the Family believed Hinman had come into an inheritance, they wanted to invite Hinman to join the Family, Hinman would have had to turn over all his worldly possessions to the Family, and Petitioner and two companions went to Hinman's house and tried to convince him to join the Family but he refused. The Deputy District Attorney then stated that Hinman was held captive and tortured for two or three days. (*Id.*). Furthermore, the Deputy District Attor-

ney stated that Manson and Tex Watson went to Hinman's house, Watson held a gun to Hinman's head and demanded money and property from Hinman, Manson sliced off Hinman's ear and then Petitioner, or another Family member, tried to sew Hinman's ear back on with dental floss. (*Id.* at 87–88). After Hinman was murdered, the Deputy District Attorney told the Board that Petitioner returned to the Family's ranch and bragged, saying with a smile, "we killed him," that Petitioner spent a lot of time at the ranch sharpening knives and talking about how it felt to stab someone, and, as Hinman lay dying after being stabbed, they forced Hinman to sign over the pink slip to two of his cars. (*Id.* at 88). The Deputy District Attorney then discussed the Tate murders and described how Petitioner and her crime partners went to the Tate residence carrying two sets of clothes and knives. (*Id.*). At the Tate residence, Voityck Frykowski struggled, tried to run and was involved in an altercation with Petitioner. The Deputy District Attorney told the Board that Petitioner stabbed Frykowski several times and he was ultimately killed, and that Petitioner later laughed when she told her cellmates in jail that Tate, who was eight-and-a-half months pregnant at the time of her murder, was the last one of the victims to die. The Deputy District Attorney told the Board that Tate was crying, begging and pleading that she not be killed so she could live and have her baby, but that Petitioner looked Tate in the eye and said, "[L]ook bitch, I don't care about you. I don't care that you're going to have a baby. You're going to die and you better be ready." Petitioner kept stabbing Tate until she stopped screaming. Petitioner was not the only one to stab Tate. (Respondent's Lodgment No. 7 at 89–90). The Board was told that Petitioner tasted Tate's blood after killing her and that the Tate murders were designed to start a race war. After the murders, Petitioner

and her companions returned to the ranch and watched television accounts of the murders and decided to continue with another murder spree. (*Id.* at 90–91). The Deputy District Attorney said that Petitioner went to the LaBianca residence the next day, and although she did not participate in the actual killings, Petitioner was there as a willing participant, and the only reason she did not go inside the residence was that Manson did not ask her to do so. (*Id.* at 91). The Board was also told that the LaBianca killings were also intended to start a race war, Mr. LaBianca's wallet was taken from the residence and planted in a gas station in what was believed to be a "Black neighborhood" so the crimes would be blamed on a black individual, and at the conclusion of the race war, Manson and his Family, of which Petitioner was an integral part, would benefit because the blacks would kill the whites, the blacks would come into power but would be unable to rule, and Manson would be there to be their leader. (*Id.* at 91–92). Finally, the Deputy District Attorney told the Board that Petitioner's disciplinary violations fit "a theme of deception and a theme of manipulation." (*Id.* at 92). (*See* Reply at 4, 18).

Although Petitioner argues that she was not given access to this information because it was not included in her central file, she does not argue that the Board considered this information in finding her unsuitable for parole. *See Pedro,* 825 F.2d at 1399 (finding due process satisfied where petitioner was given "access to all materials *considered by the Board*" (emphasis added)). Before the Deputy District Attorney made his closing statements at the parole hearing, the Board noted for the record, "[D]uring our deliberations, this Panel will be considering only relevant information pursuant to the regulations and the law." (Respondent's Lodgment No. 7 at 84). During Petitioner's counsel's closing statements and objections to the information presented by the Deputy District Attorney, the Board reiterated that it would "only be taking into consideration relevant information." (*Id.* at 100). Petitioner does not argue or provide any evidence that the Board denied parole based upon its consideration of the Deputy District Attorney's statements rather than information already included in Petitioner's central file. (*See* Respondent's Lodgment No. 7 at 157–65; *see, e.g.,* Respondent's Lodgment Nos. 2, 4–6).[21] Moreover, as

21. Petitioner argues in her Objections that California state law creates a statutory presumption that the panel considered all evidence before it. (Objections at 25). *See In re Caswell,* 92 Cal.App.4th 1017, 1031, 112 Cal. Rptr.2d 462 (2001) (citing Cal. Evid.Code § 664); *see also McQuillion,* 306 F.3d at 900 ("California law presumes that each piece of evidence presented to the granting panel was considered by it.") (citation omitted). In this case, however, the Board stated and reiterated that it would only consider relevant information, and, as stated above, the information upon which the Board based its denial was already in her central file, to which Petitioner had access. For example, the Probation Officer's Report in Los Angeles County Superior Court case number A267861 describes the circumstances of Hinman's death as follows:

On or about July 25, 1969, [Petitioner], Robert Kenneth Beausoleil, Charles Manson, Bruce Davis, and Mary Brunner, together and separately went to the home of victim, Gary Hinman, to solicit money from him. Victim, apparently failing to satisfy their requests, was kept prisoner for a period of time, cut and stabbed repeatedly. Cause of death was ascribed to a stab wound in the heart. The body was discovered on July 31, 1969.

(Respondent's Lodgment No. 5). The Board also read into the record a letter from Raymond H. Peavey, Captain of the Los Angeles Sheriff's Department Homicide Bureau, which stated in opposition to a finding of parole suitability:

On July 31st, 1969, victim Gary Hinman was found murdered in his home. An investigation later revealed that [Petitioner]

previously discussed, the Board's decision is sufficiently supported by "some evidence" in the record. *See supra* Section II.E.

The Court, therefore, concludes that the California courts' denials of Petitioner's claim were not contrary to or an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Claim Three, therefore, does not warrant federal habeas relief.

> along with Robert ... Beausoleil, Charles Manson, Mary Brunner and Bruce Davis were responsible for Hinman's death. Initially Robert Beausoleil, Mary Brunner and [Petitioner] went to Hinman's residence to obtain money. Hinman refused to give the group any money and a fight broke out. Charles Manson and Bruce Davis were called to the location by Beausoleil. Manson and Davis responded to the location and Manson slashed Hinman's face with a sword, nearly severing his ear. He later left the location, stealing one of Hinman's cars. During this robbery, victim Hinman was tortured for two days, during which time he had been beaten, slashed with a sword and held prisoner in his home. During this time, victim Hinman was forced to sign over the pink slip of his two cars, postdating his signature.... After wiping the location down to remove fingerprints, [Petitioner], Beausoleil and Brunner started to leave the location and heard Hinman making loud gurgling noises ... and the trio re-entered the location and took turns holding a pillow over the victim's face.

(Respondent's Lodgment No. 7 at 47–48). At the beginning of the hearing, the Board noted that of the 120 letters in opposition to parole that were in the confidential section of Petitioner's central file, four had been redacted and made available to Petitioner, and Petitioner's counsel confirmed that they had the documents off of which the Board would be operating. (*See id.* at 15–16, 46). Petitioner does not argue that she did not have access to Officer Peavey's letter.

Additionally, the decision denying Petitioner's initial parole consideration on July 6, 1969, restates the facts included Probation Officer's Report in case number A267861 and, with respect to the Tate and LaBianca murders in Los Angeles County Superior Court case number A253156, adds:

> [R]eferring to Counts 1 through 5, these concerned the murders which occurred on August 9, 1969 at the Polanski residence[.] As to Count 1, Abigail Ann Folger died from multiple stab wounds of the body; Count 2,

> the victim, Wojicieck Frykowski, death was caused by a gunshot wound of the left back and multiple blunt force trauma to the head. He was also stabbed. As to Count 3, the victim Steven Earl Parent, death was caused by multiple gunshot wounds; Count 4, Sharon Marie Polanski, cause of death was multiple stab wounds of the body; and the victim in Count 5, Jay Sebring, cause of death was multiple stab wounds.
> As to Counts 6 and 7, these refer to the murders of Leno A. LaBianca and his wife, Rosemary LaBianca. These killings took place on August 10, 1969 at their residence[.] Leno LaBianca's death was ascribed to multiple stab wounds to the neck and abdomen. This refers to Count 6. Count 7, Rosemary LaBianca's death was ascribed to multiple stab wounds to the neck and trunk. Count 8, conspiracy to commit murder, refers to the prisoner and crime partners conspiring to kill the victims in the first seven counts.

(Respondent's Lodgment No. 6 at 2–3). This statement of facts appears to have been taken from the factual synopsis included in the Probation Officer's Report in Los Angeles County Superior Court case number A253156. (*See* Respondent's Lodgment No. 2 at 7). In denying parole on July 6, 1969, the Board noted that, at the Polanski residence, Petitioner "soaked a towel in a victim's blood and wrote words upon the wall," and, with respect to Hinman's murder, Petitioner "first participated in a murder wherein the victim's ear was cut off with a sword and a gaping wound was inflicted on the side of his face. This victim was stabbed and tortured over a three-day period prior to his death[.]" (Respondent's Lodgment No. 6 at 4). Further, Petitioner does not dispute Respondent's assertion that the California Court of Appeal's opinion affirming Petitioner's convictions in *People v. Manson,* 61 Cal.App.3d 102, 132 Cal.Rptr. 265 (1976), which set forth details of the Tate and LaBianca murders, was also part of Petitioner's central file. (*See* Answer at 20).

### G. *Petitioner's Parole Process Was Not Arbitrary And Did Not Violate Substantive Due Process*

■ "[A] parole board's decision deprives a prisoner of due process with respect to [his constitutionally protected liberty] interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'" *Irons,* 505 F.3d at 851 & n. 2 (citations omitted); *see Hill,* 472 U.S. at 457, 105 S.Ct. 2768; *Sass,* 461 F.3d at 1129. In Claim One, Petitioner contends that her parole process was arbitrary because the Board deliberately and knowingly violated state law by: (1) allowing the Deputy District Attorney to use information not contained in Petitioner's central file and, therefore, illegally presented; (2) mischaracterizing Petitioner's role in Gary Hinman's death as a conspiracy robbery; (3) promulgating and enforcing illegal rules in violation of the Administrative Procedure Act by preventing Petitioner from reading into the record a statement of remorse to the families of the victims, and, instead, requiring her to give the statement to the Deputy District Attorney who would hand it to the families; (4) falsely claiming that Petitioner's psychiatric evaluation did not support her release; (5) relying solely on Petitioner's commitment offense to find her unsuitable for release, without indicating a single flaw in the thirty-five years of her incarceration; (6) requiring that Petitioner participate in therapy which was not available as a condition of parole; and (7) claiming that Petitioner's commitment offense was a "mutilation" crime. (*See* Petition at 5, "Additional Page"; Reply at 8–16, 22). In Claim Two, Petitioner contends that these actions by the Board violated substantive due process by intentionally subverting the parole process. (*See* Petition at 5; Reply at 17, 23).

Under *Greenholtz,* due process at a parole suitability hearing requires no more than an opportunity to be heard and a statement of reasons for denying parole. *See Greenholtz,* 442 U.S. at 16, 99 S.Ct. 2100 ("The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole[.] ... The Constitution does not require more."); *cf. Pedro,* 825 F.2d at 1399 (stating that, because parole-related decisions are not part of a criminal prosecution, "the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated" in a parole proceeding, even when a protected liberty interest exists); *Jancsek,* 833 F.2d at 1390 (same). These limited due process requirements were met at Petitioner's June 1, 2005 hearing. The record shows that Petitioner presented materials in support of parole suitability and addressed the Board on her own behalf and through her counsel, who argued extensively in support of suitability. (*See* Respondent's Lodgment No. 7). The Board read its decision setting forth its reasons for finding Petitioner unsuitable for parole and denying parole for an additional four years, and indicated that it would provide Petitioner a copy of its written tentative decision. (*See id.* at 8, 14, 157–65).

Petitioner's hearing also complied with the additional due process requirements as set forth in *Pedro* and *Jancsek. See Jancsek,* 833 F.2d at 1390; *Pedro,* 825 F.2d at 1399 ("The petitioner in the instant case had a hearing with written advance notice of the date and time, she had an opportunity to be heard, she was represented by a paralegal, she had access to all materials considered by the Board, and she submitted materials for the Board's consideration.... Under *Greenholtz,* therefore, we conclude that the petitioner received all the process due."). As discussed *supra* Section II.F, Petitioner does not dispute that she had advance notice of her June 1, 2005 hearing, that she had an opportunity

to be heard, and that she was represented by counsel and submitted materials for consideration by the Board. Nor does Petitioner argue or provide any evidence that the Board denied parole based on its consideration of the Deputy District Attorney's statements, to which she claims she had no access and were not part of her central file, as opposed to information already included in her central file.

Additionally, as discussed *supra* Section II.E, the nature and gravity of Petitioner's commitment offense provided "some evidence" with "some indicia of reliability" to support the Board's decision to deny Petitioner parole. *See Sass*, 461 F.3d at 1129 (relevant inquiry is whether "there is any evidence in the record that could support the conclusion reached by the [ ] board"); *Powell*, 33 F.3d at 40 ("some evidence" standard is "minimally stringent," and is met "if there is *any* evidence in the record that *could* support the conclusion reached by the ... board" (emphasis in original and internal quotation marks omitted)).

Even if the Board made findings that were unsupported, the Court must deny habeas relief because there still exists "some evidence" that supports the Board's finding of unsuitability, including the finding that the offense was committed in an especially cruel manner. (*See* Respondent's Lodgment No. 7 at 157–58; *see also, e.g.*, Respondent's Lodgment Nos. 2, 4–6). Cal. Code Regs., tit. 15, § 2281(c); *see Biggs*, 334 F.3d at 916 (concluding that "the district court was correct in finding that in spite of the fact that several of the Board's findings were unsupported, there was some evidence supporting the Board's decision," including the Board's reliance on the gravity of the commitment offense). The Court cannot reweigh the evidence before the Board. *Powell*, 33 F.3d at 42 ("This court cannot reweigh the evidence, but looks only to see if 'some evidence' supports the [Board's] decision."). Thus, Petitioner's contentions that the Board relied on evidence that was illegally presented or false evidence, or inaccurate or improper characterizations, do not warrant federal habeas relief.[22]

Petitioner's claims also fail to the extent they allege a violation of substantive due process. "A parole determination procedure satisfies substantive due process when 'some evidence supports the decision' of the parole board and 'the evidence underlying the board's decision [has] some indicia of reliability.'" *Abraham v. Marshall*, 2008 WL 2397588, at *6 (C.D.Cal. June 12, 2008) (citations omitted). Fur-

---

**22.** Petitioner asserts that Cal.Code Regs., tit. 15, § 2236 states that "only actions which reflect on Petitioner's personal culpability are to be considered at the hearing." (Petition, "Additional Page"). The Court disagrees. The provision does not state that *only* information concerning personal culpability may be considered. Rather, section 2236 provides:

> The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability. The board shall not require an admission of guilt to any crime for which the prisoner was committed. A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the re-

fusal shall not be held against the prisoner. Written material submitted by the prisoner under [section] 2249 relating to personal culpability shall be considered.

Cal.Code Regs., tit. 15, § 2236. The record indicates that the Board complied with the regulation at the June 1, 2005 hearing: the Board reviewed the facts and read into the record Petitioner's version of her commitment offense, and did not require Petitioner to admit to committing the offense or discuss the facts of the offense after she indicated that she would not be speaking about the crime. (*See* Respondent's Lodgment No. 7 at 15, 17, 18, 20–23). Petitioner does not argue that she submitted documents relating to her personal culpability, or, if she did, that they were not considered by the Board at the hearing.

ther, the United States Supreme Court has recognized that "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)) (internal quotation marks omitted). The Supreme Court has also stressed that when the challenge is to an executive act, only the most egregious official conduct will be considered "arbitrary" for the purposes of a substantive due process analysis. *See County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). "[T]he threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." [23] *Id.* at 847 n. 8, 118 S.Ct. 1708.

**23.** In her Objections, Petitioner argues that the standard set forth in *County of Sacramento* applies only to the "non-traditional substantive due process case in which the State officer *is acting negligently or indifferently*" and that "the traditional substantive due process case has always been one concerning deliberate and intentional actions by State employees." (Objections at 27; *see id.* at 28–29).

Petitioner's argument fails. In *County of Sacramento,* the United States Supreme Court addressed the issue of "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." 523 U.S. at 836, 118 S.Ct. 1708. The Supreme Court ultimately concluded that, "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Id.* In reaching this conclusion, the Supreme Court stated that "[s]ince the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action[.]" *Id.* at 845, 118 S.Ct. 1708. The Court noted that it had emphasized time and again that " '[t]he touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Id.* at 845–46, 118 S.Ct. 1708 (internal citations omitted). "Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]' " *Id.* at 846, 118 S.Ct. 1708 (citation omitted). The Supreme Court noted that the "cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.* at 846–47, 118 S.Ct. 1708 (citing cases). The Supreme Court noted that, because challenges to executive action on substantive due process grounds "raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law[,] ... in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n. 8, 118 S.Ct. 1708. "That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them. Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action[.]" *County of Sacramento,* 523 U.S. at 847 n. 8, 118 S.Ct. 1708. The Supreme Court noted its previous holdings that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process" and stated that "behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento,* 523 U.S. at 848–49, 118 S.Ct. 1708.

Petitioner's allegations regarding her parole proceedings do not rise to this level. For example, there is no indication that

the Board denied parole based upon the statements that the Deputy District Attorney made, which Petitioner claims were

Whether the standard of conscience shocking is reached in situations involving injuries resulting from "something more than negligence" but "less than intentional conduct" (e.g., recklessness or gross negligence), is a closer call. *Id.* at 849, 118 S.Ct. 1708. The Supreme Court determined that due process liability in a police pursuit case required "purpose to cause harm." *Id.* at 854, 118 S.Ct. 1708. Thus, the Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment[.]" *Id.* The Court found that, under the circumstances of that case, allegations of deliberate indifference to survival, or reckless disregard for life, did not shock the conscience. *Id.* at 854–55, 118 S.Ct. 1708.

Contrary to Petitioner's assertion, the Supreme Court did not explicitly state that the application of the "shock the conscience" standard described in *County of Sacramento* applied only to nontraditional substantive due process cases involving negligent or indifferent action by a state officer. Indeed, as discussed above, the Supreme Court held that cases allegations of deliberate indifference or recklessness failed to establish liability precisely because such allegations did not "shock the conscience." Furthermore, *County of Sacramento* did not, as Petitioner argues, explicitly state that the constitutional standard for arbitrariness is met merely where state officials who abuse their power or employ it as an instrument of oppression. (*See* Objections at 28). Rather, the Supreme Court in *County of Sacramento* (and the cases cited therein) noted that the "Due Process Clause was intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression." *County of Sacramento*, 523 U.S. at 846, 118 S.Ct. 1708 (internal quotation marks omitted) (citing *Collins v. Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (quoting *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)))). The Court went on to say, "To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the

conscience." *Id.* As set forth *infra*, the Petitioner's allegations regarding the Board's actions at the June 1, 2005 hearing are not "conscience-shocking."

Petitioner also argues in her Objections that the parole board is essentially an arm of the sentencing judge, and, thus, are not executive officers. (*See* Objections at 30 (citing *Cleavinger v. Saxner*, 474 U.S. 193, 204, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) ("The parole board member has been described as an impartial professional serving essentially as an arm of the sentencing judge." (internal quotation marks and citation omitted)); *Sellars v. Procunier*, 641 F.2d 1295, 1302 n. 15 (9th Cir.1981) (quoting *Bricker v. Michigan Parole Board*, 405 F.Supp. 1340, 1345 (E.D.Mich. 1975)). The cases to which Petitioner cites, however, discussed whether parole board members act as an "arm of the sentencing judge" for purposes of determining immunity from liability under 42 U.S.C. Section 1983, not whether their conduct should be analyzed under the "shock the conscience" standard for purposes of substantive due process analysis. Further, in *Sellars*, the Ninth Circuit stated, "As successors to state governors in making parole decisions, state parole board members should enjoy at the least the same immunity enjoyed by governors and other *state executives* under the common law." *Sellars*, 641 F.2d at 1302 (emphasis added). Moreover, to the extent Petitioner is attempting to raise, for the first time in her Objections, a claim that the Board members at her June 1, 2005 hearing were biased (*see* Objections at 30–32), the Court exercises its discretion to not consider the claim. *See Bovarie v. Giurbino*, 558 F.Supp.2d 1030, 1045 n. 11 (C.D.Cal.2008) ("A district court has the discretion to consider or not consider a claim raised for the time in the objections." (citing *Brown v. Roe*, 279 F.3d 742, 745–46 (9th Cir.2002)); *see id.* (exercising discretion to not consider newly raised claims in objections despite the petitioner's *pro se* status, where the petitioner had ample opportunity to present these claims at an earlier time but failed to do so, and the claims were not "novel" and did not rely on any recent change in the law such that his delay in asserting the claims should be excused).

illegally submitted. *See supra* Section II.F & n. 18. Furthermore, although Petitioner argues that the Board improperly characterized the circumstances surrounding Hinman's death as a conspiracy to commit robbery, the Court notes that such a characterization had evidentiary support. Indeed, the Board relied on the Probation Officer's Report in Los Angeles County Superior Court case number A267861, which described the attempt to solicit money from Hinman as part of the circumstances surrounding Hinman's death. (*See* Respondent's Lodgment No. 5; Respondent's Lodgment No. 7 at 31–32). Both the decision from Petitioner's initial parole consideration hearing on July 6, 1969, and the letter that Officer Peavey, Captain of the Los Angeles Sheriff's Department Homicide Bureau, submitted in opposition to parole for Petitioner, described the fact that Hinman had been robbed. (*See* Respondent's Lodgment No. 6 at 2; Respondent's Lodgment No. 7 at 47–48). Although the Board did not allow Petitioner to read into the record a statement of remorse to the victims' families,[24] the Board did allow Petitioner during her closing statement to "indicate that [she was] sorry for what [she had] done to the family as well as the victims." (*See* Respondent's Lodgment No. 7 at 126–29). The record reflects that Petitioner made such statements before the family members present at the parole hearing. (*Id.* at 130–32, 140).

Petitioner also contends that the Board falsely claimed that Dr. Smith's January 3, 2005 psychiatric evaluation was not fully supportive of her release, because it concluded with the sentence, "I am full[y] supportive of a release in accordance with these conclusions." (*See* Respondent's Lodgment No. 7 at 77–78). The Board, however, noted in its separate decision denying parole for four years that the evaluation was "somewhat inconclusive" because it also stated that "these crimes are horrific and are well beyond what is common in our community. [Petitioner] does admit responsibility and she offers what appears to be credible expressions of insight and remorse," but "[c]omplete assurance of her acceptance of responsibility, insight and remorse will probably always be clouded somewhat by the factual disputes that stem from her earlier versions of the crime." (*Id.* at 162; *see id.* at 76). In assessing Petitioner's dangerousness, Dr. Smith's evaluation also noted a risk factor possibly present for lack of insight and noted that Petitioner had a favorable risk profile for release "if she remains alcohol and substance free." (*See id.* at 77). Petitioner argues that the Board acted arbitrarily in demanding, as a condition of her release, that she undergo "further therapy in order to develop insight into the commitment offense and the underlying cause of the offense," even though, as Petitioner asserts, therapy for life inmates was eliminated in 1998. (*See id.* at 163). It does not appear, however, that the Board conditioned parole on Petitioner's receipt of additional therapy. Indeed, Petitioner stresses that the only reason that the Board provided for denying parole was the nature of her commitment offense. (*See, e.g.,* Reply at 2, 15, 19).

In sum, the Court cannot say that Petitioner's allegations regarding the Board's actions at the June 1, 2005 hearing "shock the contemporary conscience." *County of Sacramento,* 523 U.S. at 847 n. 8, 118 S.Ct. 1708. Accordingly, the Court concludes that the California courts' denials of Claims One and Two were not contrary to or an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of

---

**24.** The Board required Petitioner to give the letter to the Deputy District Attorney who then determined if the families wanted to accept the letter.

the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Claims One and Two, therefore, do not warrant federal habeas relief.

### RECOMMENDATION

The Court, therefore, recommends that the District Court issue an Order: (1) approving and adopting this Final Report and Recommendation and (2) directing that Judgment be entered denying the Petition for Writ of Habeas Corpus and dismissing this action with prejudice.

DATED: May 6, 2009.